GEORGE G. STACY *vs.* PORTLAND PUBLISHING COMPANY.

Sagadahoc. Decided June 7, 1878.

*Evidence. Libel. Damages.*

A witness testifying to threats made by a person in his presence, may be allowed to state whether he apprehended the words to have been spoken in earnest or not; but not, ordinarily, to state what he understood the speaker to mean by the words spoken by him. The words speak for themselves.

A witness may testify that a person was intoxicated at a time when such person came under his personal observation. Such testimony is not the statement of an opinion in the objectionable sense, and is admissible from necessity.

A defendant in a libel suit may justify as to a part of the libel without justifying all of it, for the purpose of reducing the damages recoverable against him.

A statement in a libelous article, that the plaintiff was "arrested for drunkenness," is not an assertion that he was in fact drunk, but only that he was arrested upon a charge of drunkenness.

Punitive damages are not recoverable in a libel suit where a jury decides that all the actual damages sustained are merely nominal.

ON EXCEPTIONS AND MOTION by plaintiff to set aside, for inadequacy, a verdict in his favor for one dollar.

CASE, for libel of and concerning the plaintiff, personally; professionally, as a lawyer; and officially, as secretary of state, published in the Portland Daily Press, September 24, 1875, under the head of "Personal," in these words:

"A responsible gentleman of Hallowell informs us that Secretary of State Stacy, was recently arrested in that city for drunkenness and disturbance. A ten dollar note quieted the affair."

The plea was not guilty, with a brief statement of the truth of the matter published and that it was proper for public information.

68   279
93   438

There was evidence tending to show that the plaintiff was admitted to practice law in 1858, practiced a year or more, was then elected member of the legislature, and remained at Augusta ever after, first as engrossing clerk in the office of the secretary of state, then as state librarian, then four years as deputy secretary of state; was elected secretary of state first in January, 1872, and held the office till October 1, 1875.

Charles E. Nash testified to a conversation at the Kennebec Journal office, in June, 1875, with Col. Z. A. Smith, associate editor of the Press, who inserted the item alleged to be libelous. " The subject of the conversation was the removal of the Col.'s brother, Joseph O. Smith, from the office of the secretary of state.".

" The Col. was excited; I tried to quiet him, bantered him somewhat. He was very much displeased at the removal of his brother; said it was made by Stacy. He wanted me to go and see Stacy with him, to see if it could not be reconsidered. He said among other things, that he was going to impeach Stacy at the next session of the governor and council. I laughed at him; told him he was foolish. Think I calmed him some. He said ' I am going to ruin that man.' ·I told him he had better not attempt to make any war upon Stacy. I was a friend to both; he asked me if I would go with him to Stacy's house. He said, if I go I shall do something foolish while there."

William P. Whitehouse testified to a conversation at his office with Z. A. Smith, on the same subject, June 19, 1875. "He asked me to intercede with Stacy for the reinstatement of his brother. He complained in somewhat extravagant language of Stacy's treatment, and in a cool manner, which excited my laughter, said that he thought a very proper thing was to shoot him. I agreed to see Mr. Stacy that afternoon but did not, and called at the depot to explain why. Smith said he had seen Stacy himself, that afternoon. I said, I thought perhaps the matter could be satisfactorily arranged between them; would see him if possible next day. He said he didn't think it was of any use; that he should bide his time and knife him the first chance he got. I laughed at him and told him he had better keep cool. In his tones and manner, there was an assumption of coolness; I don't remember that he laughed any; he was very angry.

"I think he said, he thought the only proper thing to do, was to shoot him ; I don't remember precisely what his language was ; he seemed to be revolving the propriety of doing it. Of course I laughed and ridiculed the idea."

On cross-examination : Ques. Did he have an exaggerated way of talking ? Obj. to and admitted. Ans. I think he had· Ques. You did not apprehend that he was going to shoot Mr. Stacy ? Obj. to and admitted. Ans. I did not really think that he intended to or would shoot him.

Re-direct : Ques. You was asked whether you apprehended from his conversation, that he was going to shoot Mr. Stacy ; and that he would bide his time and knife him the first chance he got. What did you understand him to mean ? Obj. to and excluded.

The defendants offered to put the truth of the alleged libel in evidence. The plaintiff objected because the pleadings did not assert the truth of the whole libel, or that ten dollars was paid to quiet the affair and in confession of guilt ; there could not be a justification *pro tanto*. The court admitted the evidence, which tended to prove that defendant, on the evening of August 31, 1875, was driving alone in a high top buggy from Augusta to Hallowell ; that the wheels of his carriage came in collision with the carriage wheel of one Trask, who had stopped by the road side to water his horse ; that an altercation ensued ; that the parties proceeded to Factory lane in Hallowell, where the plaintiff was confronted by Trask and city marshal Young with the charge of running into Trask's carriage ; that he refused at first to give his name till threatened with arrest ; that he was very angry, used much profane and abusive language, and in the opinion of witnesses, admitted against plaintiff's objection, was intoxicated ; that he was ordered by the city marshal to appear at the judge's office the next morning to answer for drunkenness and disorderly conduct ; that he there appeared and requested Mr. Snow to see the city marshal, " to settle up the difficulty and have it stopped ;" that Snow was informed by the city marshal that it could be settled for $10, and Snow told him not to bring an action or take out a warrant, and that if Stacy did not pay the $10, he, Snow,

would see it paid ; that these facts were communicated by Snow to Z. A. Smith.

The plaintiff testified : " The evening was quite dark ; .I was driving about four miles an hour when I struck Trask's carriage ; Trask said, you have injured my carriage and have got to pay damage ; I denied I was at fault and laid the blame on Trask ; used forcible language, might have used profanity ; Trask demanded $10 for springing his axle ; went to the city. Marshal Young said this is Trask, he claims $10 for injury to his carriage ; I was excited, said I should not pay anything, that Trask was to blame ; told them my name, the man doubted it ; I don't know but I said he was a damned fool. I told him if he doubted my word to get into my carriage, I would take him to Mr. Bodwell, Mr. Wilson or Maj. Rowell ; he said they will not want to see you in the condition you are in ; I said I can take care of myself and don't ask any favors. I propose to visit respectable men, so you will be able to determine my condition ; he fell back on the damages, said Trask says you must pay ten dollars or he will sue you ; told him I should sue Trask ; should appear at 9 o'clock in the morning, and left for home ; next morning saw the marshal, inquired for Trask ; was told he thought he would not press his claim ; I never asked Snow to settle the matter or commissioned him to act for me ; during that day and evening I had not tasted any intoxicating liquor in any form whatever, that I am aware of ; I had not taken a drop of wine or ale, no kind of liquor ; I hadn't had access to any ; I hadn't been where they kept it, at any store, shop or public place, nor to any private house, except where I boarded ; I think, the only places where I was that day—I was ill—was the Western Avenue House, Mr. Harding's and my stable ; I was at Maj. Fogler's house, I didn't go in ; went there before tea ; told him what the matter was, a bowel trouble ; the Maj. recommended Jamaica ginger, and brought out a small vial having not more than two teaspoonfuls of Jamaica ginger in it ; he gave it to me, and advised me to take it ; I don't know whether I took all at one time or twice ; it was all taken before tea ; after tea went to Hallowell and back ; my carriage was not injured."

Among other things not objected to, the presiding justice instructed the jury as follows :

" Was the plaintiff arrested in Hallowell for drunkenness and disturbance ? Was he arrested there at all ? And, if so, was it for drunkenness and disturbance ? Because, you will perceive that the article published, on this branch, contains two statements of fact; one that he was arrested, the other that the arrest was for drunkenness and disturbance.

" I have already stated to .you that the burden is upon the defendants to prove strictly and fully the truth of the facts set out in the publication. . . .

" Have the defendants proved that the officer, Mr. Young, arrested the plaintiff on the night in question within this rule of law ? Did he inform the plaintiff, in substance, that he arrested him ? Did the plaintiff so understand it and yield himself to the authority of the officer, thus asserted ? If so was he arrested for drunkenness and disturbance ? Or was it for the purpose of compelling the plaintiff to pay damages to Mr. Trask ? You have heard the evidence upon this branch of the case. . . .

" If arrested was it for drunkenness and disturbance ? If so, upon this branch of the case, I instruct you that this defense is made out so far as these two facts are concerned, although the plaintiff was not in fact drunk. Because, you will perceive that the charge in the article is not that the plaintiff was drunk; it is that he was arrested for drunkenness and disturbance. You will determine whether the defendants, having the burden of proof upon them, have satisfied you that that assertion in the article was true.

" Then pass to the other portion of this article—' A ten dollar note quieted the affair.' . . .

" The elements of damage which you are authorized to consider are, the damage to his character as a man, as a citizen, pain, mental pain and suffering, anguish, mortification, loss of the benefits of public confidence and social intercourse, which are the natural and necessary results of the publication.

" Then there are elements which you may consider in determining the amount of damages—elements of aggravation if you find them to exist. It is claimed here that there was express malice. If you find there was express malice you are authorized to consider it as aggravating the damages."

The plaintiff's counsel requested the instruction that if the jury found the article complained of was published with express malice, they might give exemplary damages. This instruction the presiding justice refused. The verdict was for plaintiff; damages one dollar.

*O. D. Baker*, for the plaintiff, contended, among other things, that the libel should be taken as a whole, and not each part considered by itself as in the instructions; that, as a whole, it speaks not merely of an arrest, but fastens upon the plaintiff one charge, that of being turbulently and disgracefully drunk in the public streets, bolstered by two proofs, the arrest by a policeman to show the scandal, and the cowardly confession of guilt to show the truth of the charge; that if the publication was with express malice it was not enough to consider that as aggravating the damages; it should have carried exemplary damages.

*T. B. Reed*, for the defendants.

PETERS, J. A witness for the plaintiff testified thus: "He (the author of the publication complained of) in a cool manner, which excited my laughter, remarked that he thought a very proper thing was to shoot him " (plaintiff). The plaintiff finds fault with the court in allowing the witness to be asked on cross examination whether he really apprehended the speaker was going to shoot Mr. Stacy. This did not transcend the discretionary power of the presiding judge. The statement of the witness naturally enough called for the question. At the same time, it was unimportant and immaterial. It is evident enough that no one apprehended such a thing. The expression was rhetorically extravagant, merely. Besides, a witness could be asked whether words were spoken angrily or not, or earnestly or not, which would have been tantamount to the question put. *Haynes* v. *Haynes*, 29 Maine, 247.

Upon re-examination, the witness was not permitted to state what he did understand Mr. Smith to mean by the threats of knifing and shooting the plaintiff. The plaintiff contends that this inquiry was rendered permissible by the admission of the previous question and answer. We think otherwise. The plain-

tiff could have shown the condition of feeling that the speaker was in, and any extrinsic facts and circumstances, in order to elucidate what was meant. Anything more was needless, as the words speak for themselves. *Snell* v. *Snow*, 13 Met. 278. Where the speaker's meaning is conveyed, not in direct terms, but by incomplete expressions, or by signs or gestures or tones of voice, it might be competent in some cases for witnesses to testify what they understood by them. It was so held in *Leonard* v. *Allen*, 11 Cush. 241. This rule, however, was construed quite strictly in *White* v. *Sayward*, 33 Maine, 322.

A witness was allowed to state that at a certain time—the fact being material—the plaintiff was intoxicated. This was objected to as being the expression of the opinion of a witness. Such testimony was directly decided to have been admissible in *People* v. *Eastwood*, 14 N. Y. 562. In a certain sense, a vast deal of testimony is but statements of opinion. But it is not opinion in an objectionable sense. It is every day practice for witnesses to swear to such facts as the quantity, weight, size, and dimension of a thing, to heat and cold, age, sickness and health, and many other matters of the kind. In such cases, witnesses do not express an opinion founded on hearsay or the judgment of other men. It is not an opinion based upon facts recited and sworn to by other witnesses. It is their own judgment, based upon facts within their own observation. It is, so far as such a thing can be, knowledge of their own. It is an opinion which combines many facts without specifying them. It has been described as " an abbreviation of facts," a " short-hand rendering of facts." It is an inference equivalent to a specification of the facts. Whar. Ev. § 510. The witness in effect describes the facts when he gives his opinion. It is his way of stating them. Such testimony is admitted from necessity. A witness can seldom give in detail all the points and particles which go to make up his belief, but he can characterize them. Practically, the rule admitting such *quasi* opinion is convenient and safe. Trials would be almost endlessly protracted without it. Of course it must be applied with discrimination. *Vide* Whar. Ev., section cited *supra*, and following sections; and notes. *State* v. *Pike*, 49 N. H. 399, 408. *Hardy*

v. *Merrill*, 56 N. H. 227. *Commonwealth* v. *Sturtivant*, 117 Mass. 122. *Dunham's probate appeal*, 27 Conn. 192, 193. *Robinson* v. *Adams*, 62 Maine, 369, 410, 411.

The plaintiff contends that it was error for the judge to rule that the defendants could justify as to a part of the libel without justifying all of it. This was too obviously correct to require more than a word of comment. It might with as much force be asserted that a plaintiff cannot prevail unless he proves all he alleges, as that a defendant cannot defend against a part of the charges against him. A justification in part does not, of course, exculpate a defendant, but would have a tendency to reduce the damages.

The libel declared that the writer had been informed that the plaintiff some time before " was arrested for drunkenness and disturbance." The plaintiff's counsel contends that this was an assertion that the plaintiff was in fact drunk, making a disturbance, and was arrested for it. The ruling was, that the language did not amount to saying that the plaintiff was in fact drunk, but that it meant that he was arrested upon a charge of drunkenness. This to our minds was exactly the true interpretation of the words used. The writer does not say that the plaintiff was drunk, but he declares that somebody else says so. He does not make the charge, but he informs the public that some one has made such a charge; or, more accurately, he states that a gentleman informed him that such a charge was made. The item does not assert the charge to be true. It asserts that an accusation of drunkenness was made against the plaintiff. To say that a man was arrested for an assault is not a declaration that he committed an assault. To say that a man was arrested for murder and indicted for murder and tried for murder, would not be saying nor be equivalent to saying that he was in fact guilty of such a charge. If it were so, the newspaper press would be sorely perplexed for publishing the current news. Stress is put by the plaintiff upon the additional words of the article: " A ten dollar note quieted the affair." This, at most, was a statement that the charge subsided or the arrest was abandoned for the sum named. We think the article is not susceptible of the meaning ascribed to it

by the plaintiff. The case of *Haynes* v. *Leland*, 29 Maine, 233, recognizes a distinction between the positive assertion of a fact and a statement of information as to such fact, in an action of slander.

The plaintiff's counsel earnestly insists that it was error on the part of the court to omit (after request) to direct the jury that punitive damages might be recovered in such a case as this. Taking the case as it resulted, we are satisfied that the plaintiff has sustained no injury in this respect. Without overruling former decisions, this court cannot deny that punitive damages may be recovered against a corporation for the malicious conduct of its servants and agents, by a person injured by it. To the facts and findings, however, presented in the case at bar, our judgment is that the doctrine contended for has no reasonable application. The charge against the plaintiff was of a serious nature, calculated to wound his sensibilities and to degrade him in his personal character. A substantial, but not a full and complete, justification of the charge was pleaded by the defendants. The plaintiff was allowed to recover damages for the injury " to his character as a man, a citizen ; for mental pain and suffering, anguish, mortification, and for loss of the benefits of public confidence and social intercourse," resulting from the publication. The jury were permitted to add, as actual damages, for any aggravation of these elements of injury occasioned by the express malice of the person who published the article complained of. The jury assessed nominal damages only, the verdict being for one dollar. The legal signification of the verdict is, either that there was no actual and express malice entertained towards the plaintiff by the defendants' agent, or that, if there was, it did the plaintiff no injury. There is no room for punitive damages here. There is no foundation for them to attach to or rest upon. It is said, in vindication of the theory of punitive damages, that the interests of the individual injured and of society are blended. Here the interests of society have virtually nothing to blend with. If the individual has but a nominal interest, society can have none. Such damages are to be awarded against a defendant for punishment. But, if all the individual injury is merely technical

and theoretical, what is the punishment to be inflicted for ? If a plaintiff, upon all such elements of injury as were open to him, is entitled to recover but nominal damages, shall he be the recipient of penalties awarded on account of an injury or a supposed injury to others beside himself ? If there was enough in the defense, to mitigate the damages to the individual, so did it mitigate the damages to the public as well. Punitive damages are the last to be assessed, in the elements of injury to be considered by a jury, and should be the first to be rejected by facts in mitigation. We think the irresistible inference is, that, if the instruction had been given as it was requested, the verdict would not have been increased thereby to the extent of a cent. There may be cases, no doubt, where the actual damages would be but small and the punitive damages large. But this case is not of such a kind. It would have been proper in this case for the presiding justice to have informed the jury, that, if the actual damages were nominal and no more, they need not award punitive damages. Any error in the ruling was cured by the verdict. *Gilmore* v. *Mathews*, 67 Maine, 517.

Some other points appear to have been raised at the trial, which are not discussed in the very full and able brief of the plaintiff's counsel, and we may very well regard them as now waived. A motion is made against the verdict as too small. The court rarely interferes with a verdict in a case of this kind, whether moved against as too large or too small. We do not allow the motion.

*Motion and exceptions overruled.*

Appleton, C. J., Walton, Barrows, Virgin and Libbey, JJ., concurred.