Alfred Bornmann, Respondent, *v.* The Star Company, Appellant.

1. Libel — Defamatory Publication Referring to Class or Group of Persons — When One of Such Persons May Maintain Action for Libel. Where statements contained in an article published by a newspaper, which described and censured the acts of a number of medical graduates, who were employed upon the house staff of a public hospital, in hanging an effigy of the medical superintendent of the hospital, although true in part, were erroneous and defamatory in some respects one of the medical graduates referred to in such article may maintain an action for libel against the newspaper, since the legal effect of the publication is the same as if he had been the only physician referred to, and, where the answer mentioned him by name, as if reference had been made to him *eo nomine.*

2. Same — Whether Defamatory Statements Apply to Person in Professional Capacity a Question of Law. Where the article, although some of its statements of fact are true, untruthfully and erroneously describes and refers to the plaintiff "as a jackass disguised as a doctor, a brute graduated to care for the sick, a ghoul graduated to mutilate the dead, a degenerate graduate deserving arrest and punishment, a savage unworthy to retain his diploma, who, although engaged as a doctor to treat the patients in a hospital, maltreated the corpse of an old man who had died there by stringing it up in a public place and dancing around it," it must be held as a matter of law that the plaintiff was assailed in his professional capacity and that such charges reflected upon his capacity and affected his reputation as a professional man, and that the article is, therefore, libelous and actionable *per se.*

*Bornmann* v. *Star Co.,* 72 App. Div. 633, affirmed.

(Argued February 13, 1903; decided March 24, 1903.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered June 11, 1902, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

This action was brought to recover damages for a libel based upon two publications in a newspaper issued by the defendant known as *The New York Journal,* one a news article under date of January 16th, 1900, and the other an editorial on the following day. They are as follows:

"Used A Dead Body To Perpetrate A 'Joke.'— Ghastly Performance Of Twelve Young Doctors Leads To Their Instant Dismissal From The City's Service.— Took The Body Of A Dead Charity Patient And Strung It Up As An 'Effigy' Of The Superintendent.— Were Angry At Him Because Of His Rules Regarding The Association Of Doctors With The Nurses.

"Because they hanged a dead body in front of the door of the Superintendent of the Metropolitan Hospital on Blackwell's Island and labeled it with the Superintendent's name, twelve young physicians of the house staff of that institution were summarily dismissed yesterday.

"The Superintendent is Dr. George T. Stewart. The house staff, as is the custom with other public hospitals, are young men who are recent graduates from medical colleges.

"At 2 o'clock on Sunday morning the young men went to the hospital morgue, took out a dead body and carried it to the lawn in front of Dr. Stewart's home, which is close beside the hospital. They had entertained visiting friends at dinner and were in high spirits.

"Upon the body they pinned a placard, on which was written 'Dr. George T. Stewart,' with some critical remarks added. Then they put a rope around the body, strung it up to a pole so that the doctor could see it when he looked out of his window in the morning and went away, almost bursting with laughter.

### "Cut Down By a Watchman.

"A watchman took the body down after it had hung for two hours, and reported the matter, whereupon Dr. Stewart quietly began an investigation.

"Yesterday morning each of the twelve received a note suspending him from duty. Appalled at this, they hastily wrote a letter of apology, and each of them signed it. But meanwhile Dr. Stewart had reported the entire matter to Commissioner John W. Keller, of the Department of Charities.

"'I was greatly incensed,' said the commissioner yesterday,

and 'thought that instant dismissal was the only punishment for such an offense.'

"The doctors were told to leave the Island at once, and they did so. There were about five hundred patients in the hospital, but the visiting staff were at once notified, and eleven of them responded and arranged to divide the hospital work between them till new assistants could be secured.

### "Their Ground of Complaint.

"Commissioner Keller said the effigy hanging may have come from the impatience of the house staff at rules enforced by Dr. Stewart, prohibiting the association of doctors and nurses except in the discharge of their duties.

"Several of the discharged doctors admitted that ill-feeling had arisen on account of the strictness of Dr. Stewart's rules. He had, they said, forbidden them to talk or visit with nurses at night, and on Friday was very angry on learning that two of the doctors had been served with coffee and toast at four in the morning by a nurse in the diet kitchen. They said, too, that the superintendent had of late directed the watchman to follow and watch them closely.

### "Ghouls in the Charity Hospital.

"A few days ago an ambulance was called to remove a child to an uptown hospital. It had been run over by a delivery wagon. The ambulance contained a jackass in the guise of a young doctor. He prodded and punched the child and pronounced it all right and merely suffering from shock. Then he clanged his bell and drove away. Five minutes later the child died.

"In the Charity Hospital — supposed to be God's house of mercy and pity — an old man died. He was white-headed and withered and worn with life's battles, but his pallid lips wore almost the only smile they had ever known.

"Here again were many jackasses in the guise of doctors. They hated the superintendent, Dr. Stewart.

"The aged dead man slept in a box. The young doctors hauled him out, carried him over the lawn and strung him up

by the neck in front of Dr. Stewart's house, a horrible, grisly object swinging in the wind. Then they danced around it.

"The doctor who allowed the baby to die still holds his position. The doctors who hanged the old man were discharged for insulting Dr. Stewart and acting disrespectfully toward the dead.

"But how about an educational system which will permit savages like these to retain their diplomas?

"When our hospitals graduate brutes to care for us in sickness and ghouls to mutilate us when dead, of what avail are prayers for the living or graves for those who are gone?

"The mere punishment of discharge should not suffice to cover such an outrage. Although Superintendent Keller went as far as his powers lie, the city authorities should take the matter up, arrest these degenerate graduates and give them at least an instalment of their deserts."

The plaintiff was one of the assistant house surgeons composing the residential staff in the hospital and was one of the twelve who were discharged. The Metropolitan Hospital was maintained by the department of charities of the city of New York, which was under the control of the commissioner of charities, John W. Keller. Dr. Stewart was the superintendent in charge of the hospital which was supplied with female nurses, and one of the rules forbade them from associating with the young doctors. There had been some hostility on the part of the young doctors to the superintendent by reason of his enforcement of this rule, which culminated on Sunday morning, January 14th, 1900. It appears that the doctors had constructed an effigy of the superintendent in one of their rooms in the hospital, dressing and painting it in such a way as to represent him as nearly as they could make it. They took it out after midnight and hung it by the neck upon a telegraph pole in front of the superintendent's house. Then they went to the dead house connected with the institution, the door of which was locked, and forced open one of the windows, bending in the fastenings, and some of their number crawled in through the window. Underneath the window

stood a coffin containing the body of a woman. It rested upon blocks and was subsequently found to have been moved up nearer to the window. Those who entered found three coffins which were empty and they passed them out of the window to those outside and they were taken across the yard to a point near the landing and were then set up on end and a placard labeled " God's Victims" placed thereon. The articles published were erroneous in stating that the body of a man had been taken from the dead house and hung in effigy before the superintendent's residence. Coffins only were taken and the effigy was constructed out of clothing, paper and other articles.

*Clarence J. Shearn* for appellant. The court erred in holding, as a matter of law, that the libel referred to the plaintiff, and in refusing to submit the question of application to the jury. (*Stokes* v. *M. J. Assn.*, 66 App. Div. 569; *Van Vechten* v. *Hopkins*, 5 Johns. 211; *Squire* v. *P. P. Co.*, 58 App. Div. 362; *Ryckman* v. *Delevan*, 25 Wend. 186; *Maynard* v. *Beardsley*, 7 Wend. 561; *Weed* v. *Bibbins*, 32 Barb. 315; *People* v. *Parr*, 42 Hun, 313; *Gibson* v. *Williams*, 4 Wend. 323; *Sanderson* v. *Caldwell*, 45 N. Y. 398.) The complaint does not state a cause of action, and the court erred in refusing the motion to dismiss made at the opening. (*Miller* v. *Maxwell*, 16 Wend. 1; *Fry* v. *Bennett*, 5 Sandf. 54; *Cassidy* v. *Brooklyn Eagle*, 138. N. Y. 239.) The court erred in instructing the jury that the articles " assailed the plaintiff in his professional capacity," and that plaintiff was entitled to compensation for " any injury to his reputation as a physician." (*Van Tassell* v. *Capron*, 1 Den. 250; *Oakley* v. *Farrington*, 1 Johns. Cas. 130; *Keene* v. *Tribune Assn.*, 76 Hun, 488; *Kinney* v. *Nash*, 3 N. Y. 177; *Purdy* v. *R. P. Co.*, 96 N. Y. 373; *Moore* v. *Francis*, 121 N. Y. 199; Townshend on Slander & Libel, § 190.)

*George L. Robinson* for respondent. The court did not err in holding as a matter of law that the libel refers to the

plaintiff and refusing to submit the question of publication to the jury. (*Van Ingen* v. *M. & E. Co.*, 156 N. Y. 376; *Gabriel* v. *R. P. Co.*, 8 App. Div. 450.) It is not necessary, in an action for libel and slander, to state in the complaint any extrinsic fact for the purpose of showing the application to the plaintiff of the defamatory matter, but the plaintiff may state generally that it was published or spoken concerning him, and if that allegation is controverted the plaintiff must establish it on the trial. (Code Civ. Pro. § 535.) The court did not err in instructing the jury that the articles assailed the plaintiff in his professional capacity. (*Krug* v. *Pitass*, 162 N. Y. 160; *Mattice* v. *Wilcox*, 147 N. Y. 624; *Cruikshank* v. *Gordon*, 118 N. Y. 178.)

Vann, J. The legal effect of the publication complained of is the same as if the plaintiff had been the only physician referred to and, in view of the answer which mentions him by name, as if reference had been made to him *eo nomine.*

The article described the plaintiff as a physician and said, in substance, that he was a jackass in the guise of a doctor. It further charged that the medical school which gave him his diploma as a doctor of medicine graduated him, a brute, " to care for us in sickness," and a ghoul, " to mutilate us when dead." It criticized, by suggestion, the educational system which permitted such a savage to retain his diploma and urged the public authorities to arrest him as a degenerate graduate and to give him at least an installment of his deserts. It spoke of him as one of the doctors employed to care for the patients in a charity hospital, who hauled from his coffin, while still in the hospital awaiting burial, the dead body of a patient, " white-headed and withered and worn with life's battles," and strung him up by the neck in front of Dr. Stewart's residence, " a grisly object swinging in the wind," and danced around it and thus insulted both the living and the dead.

Too much of the article was true, but all was not, yet the plaintiff was besmirched by it all, not as an individual, but as

a physician. It does not say simply that Alfred Bornmann was guilty of the outrage, or even that Doctor Bornmann was thus guilty, but it coils its sentences around him as a physician by describing him as a jackass disguised as a doctor, a brute graduated to care for the sick, a ghoul graduated to mutilate the dead, a degenerate graduate deserving arrest and punishment, a savage unworthy to retain his diploma, who, although engaged as a doctor to treat the patients in a hospital, maltreated the corpse of an old man, who had died there, by stringing it up in a public place and dancing around it.

It is not the individual, but the doctor, the savage with a diploma, the brutish, ghoulish, degenerate graduate, who is held up to public scorn by the strong language of the article. The plaintiff was attacked in his professional capacity, because he was denounced as a physician, with a diploma, but unworthy of it, a graduate guilty of an atrocious wrong, a doctor, but nevertheless a jackass, a savage, a brute, a ghoul and a degenerate. While on duty as a doctor at the hospital he is said to have invaded its dead house and inflicted a monstrous indignity upon the body of a gray-haired old man who had been his patient but a short time before. His calling as a physician permeates the editorial and appears in nearly every sentence. As I read the entire publication, a degenerate graduate means a degenerate doctor, and an institution that graduates brutes and ghouls means one that turns out doctors who are brutes and ghouls like the plaintiff.

Was it error, under these circumstances, for the trial court to hold, as matter of law and the Appellate Division to unanimously sanction the holding, that the plaintiff was assailed in his professional capacity?

The article imputed to a physician the ignorance of a jackass, the brutality of a savage and the fiendishness of a ghoul, which presumptively injured his professional reputation. Is a jackass in the guise of a doctor, a savage unfit to retain his diploma as a physician, a graduate of a medical school who is a brute, a ghoul and a degenerate, fit to properly practice his profession? Did not such charges necessarily

reflect upon his capacity and tend to lessen public confidence in him as a professional man? " If the words be of probable ill-consequence to a person in a trade, or profession, or office" they are actionable *per se*. Is such a physician as the plaintiff is said to be worthy of employment? Would people be apt to engage him to enter their households and care for their sick? Did not the language used "touch" the plaintiff, that is, affect him, in his special character, more than it would a person in any other profession or calling?

To say of a minister that he is immoral, of a lawyer that he is an ignoramus, a drunkard or a cheat, of an architect or a teller of a bank that he is crazy, of a physician that he is a humbug, or a quack, or a butcher, or a blockhead, or a quacksalver, or an empiric, or a mountebank, or that he is no scholar, or that his diploma is worthless, has been held actionable *per se*, as touching the vocation. (*Krug* v. *Pitass*, 162 N. Y. 154; *Moore* v. *Francis*, 121 N. Y. 199, 204; *Cruikshank* v. *Gordon*, 118 N. Y. 178, 183; *Sanderson* v. *Caldwell*, 45 N. Y. 398, 402; *White* v. *Carroll*, 42 N. Y. 161; *Tarleton* v. *Lugarde*, 46 La. Ann. 1368; 26 L. R. A. 325; *Clifford* v. *Cochrane*, 10 Ill. App. 570; *Cawdry* v. *Highley*, Cro. Car. 270; *Peard* v. *Jones*, Cro. Car. 382; *Allen* v. *Eaton*, 1 Roll. Abr. 54; *Doddart* v. *Haselfoot*, 1 Viner's Abr. [S. a.] pl. 12; *Southee* v. *Denny*, 1 Exch. 196; Cooke's Law of Defamation, 18; 18 Am. & Eng. Ency. [2d ed.] 961.)

The case before us comes within the principle of the cases cited and others referred to therein. While the plaintiff, in view of his own testimony, deserves little sympathy, he is entitled to his legal rights and to have such character as he had left after his foolish conduct protected from destruction by defamation.

The judgment should be affirmed, with costs.

HAIGHT, J. (dissenting). Upon the trial the court charged the jury that the matter published was an untruthful statement in a substantial particular, and that it was spoken of the plaintiff " in relation to his profession and assailed him in his

professional capacity, and that, therefore, it is libelous in and of itself." An exception was taken to so much of this charge as states that the writing was of and concerning the plaintiff in relation to his professional capacity.

Many statements published of an individual to some extent affecting his standing and reputation, only become actionable when special damages are alleged and shown; but when the publication tends to injure him in his profession or business, or to charge him with the commission of a crime, it becomes actionable *per se*. It will thus be seen that statements published tending to injure a person in his profession or business are an aggravation of the offense, and are ordinarily more heavily punished than where a statement is published concerning the individual. We incline to the view that both articles were libelous *per se*. Both charged the plaintiff with offenses under our Penal Code. It was a libel and misdemeanor to hang Dr. Stewart in effigy. (Sec. 242.) It was a felony to break into the dead house and remove a body therefrom for the purpose of hanging it in effigy. (Sec. 313.) It was also an offense to break into the dead house for the purpose of removing coffins. (Sec. 505.) The plaintiff, therefore, would be entitled to recover some damages unless the charges were true. It now appears that he was, in fact, guilty of a misdemeanor in taking part in the hanging of Dr. Stewart in effigy. It also appears that he was guilty of a misdemeanor, if not of a graver crime, in assisting in the breaking into the dead house and in the taking of the three coffins therefrom. He did not, however, as we have seen, take a dead body from the house. In so far as he has damaged his own character by the offenses that he has committed, he is without remedy and must suffer the consequences. He can only recover such damages as he has sustained by reason of the additional charge of which he was not guilty. This was the measure of the defendant's liability; but the jury, as we have seen, was permitted to include another element — that of injury to plaintiff's profession or business. In determining this question it becomes necessary to carefully review the arti-

cles published. The news article purports to give a detailed account of what transpired, and we discover nothing in it that is an attack upon plaintiff's skill or ability as a physician and surgeon. The reference in the editorial to the doctor who attended upon the child run over by a delivery wagon is an independent matter having no connection with the charge against the medical staff of the hospital of which the defendant was a member. It is true that the plaintiff with his associates are spoken of as ghouls, jackasses, brutes and degenerates. It is also true that if these words were spoken of and concerning the plaintiff's skill or capacity in his profession, damages would be recoverable for this injury; but we think that reading all of the statements in the articles together they very clearly disclose the purpose of the writer in using these expressions as applying to the transaction detailed, and not to the plaintiff's professional capacity, skill or ability as a physician. As applied to the plaintiff's conduct on the night in question they furnished a basis for no additional allowance by way of damages, for, adopting his own story of the transaction as given upon the witness stand, it was, to speak mildly, a most disgraceful affair meriting the condemnation of every law-abiding citizen. The libel upon the superintendent was bad enough, but this sinks into insignificance when we contemplate the injury that may result to the institution. A hospital, dependent upon the liberalities of the charitably inclined for its support, maintaining a staff of physicians who violate in the night the repository of their own dead, may be deprived of many liberal contributions that it otherwise would have obtained had it not been for such conduct.

We conclude that the charge, as made, was erroneous in the particular alluded to, and for that reason the judgment should be reversed and a new trial ordered, with costs to abide the event.

PARKER, Ch. J., MARTIN and WERNER, JJ., concur with VANN, J.; GRAY and O'BRIEN, JJ., concur with HAIGHT, J.

Judgment affirmed.