## GARDELLA v. LOG CABIN PRODUCTS CO., Inc., et al.

### No. 254.

Circuit Court of Appeals, Second Circuit.
May 10, 1937.

Lester E. Waterbury, of New York City (Lester E. Waterbury and Mansfield C. Fuldner, both of New York City, of counsel), for appellants.

Samuel Robert Weltz, of New York City, for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Appellee, a stage and radio performer, obtained a judgment below in an action at law for $115,966.27, based upon a claim of unfair competition and violation by the appellants of the Civil Rights Law, §§ 50 and 51 (Consol.Laws, c. 6), in the use of appellee's name "Aunt Jemima" in connection with advertising broadcasts over a radio station in New York City on October 2, 9, and 16, 1935. Log Cabin Syrup and Aunt Jemima's Pancake Flour were jointly advertised over the facilities of the National Broadcasting Company on each of these dates. Log Cabin Syrup was a product of the Log Cabin Products, Inc., a subsidiary of the General Foods, Inc., and the Aunt Jemima Pancake Flour was a product of the Quaker Oats Company. Some 3,000,000 small packages of Aunt Je-mima's Pancake Flour were distributed free through grocery stores as a part of the scheme of advertising.

The name "Aunt Jemima," in conjunction with the face of a smiling negress and the words "Pancake Flour," is a trademark adopted by the predecessors of the Quaker Oats Company and registered in 1890. It was held valid and its infringement enjoined in Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407, L.R.A.1918C, 1039 (C.C.A.2), cert. den. 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540. The phrase "I'se in Town, Honey," was registered in 1903. These registrations are still effective and are owned by the Quaker Oats Company. This company does an extensive business throughout the United States, its average annual output of pancake flour being in excess of 24,000,000 packages. The product has been advertised extensively and oftentimes by public appearances of colored women portraying the Aunt Jemima character whose face appears on the packages.

An agreement for a joint advertising campaign was entered into between the appellant, Log Cabin Products Inc., and the Quaker Oats Company. An exchange of letters constitutes the agreement. It was stipulated that the General Foods Corporation should "mention Aunt Jemima as a character and as a product in a favorable light on the radio program," this "for the joint promotion of Aunt Jemima and Log Cabin syrup." As the record discloses, in the performances on the dates in question the name "Aunt Jemima" was used solely in connection with pancake flour.

The appellants endeavored to employ the appellee, through their advertising agents, to take the part of Aunt Jemima in these performances. Negotiations ensued but were dropped because of inability to agree on compensation, whereupon the appellants employed Georgia Burke, a colored actress, to read the dialogue and Eva Taylor, a colored entertainer, to do the singing. The recordings of the broadcasts were exhibited before the jury. The performers were not referred to other than as Aunt Jemima.

Appellee, a white woman, of Italian extraction, with an excellent professional reputation, has sung and acted extensively on the legitimate stage and in radio performances. She said the Aunt Jemima character suggested itself to her because as a child she received that name from

a colored maid who cared for her. Newspaper interviews, granted by her, which were offered in evidence, gave other reasons, one of which was that the name came to her thoughts through the pancake flour advertisements. At any rate, in her many stage performances since 1920 she has used that name; sometimes as "The Famous Pancake Lady, Aunt Jemima, and her Syncopated Bakers." She appeared in the production "Show Boat" as Aunt Jemima and also on a radio program for "Jad Salts." She sang for phonograph records.

On the trial below both causes of action, the one based on unfair competition and the other on the Civil Rights Law of New York, were submitted to the jury over the appellants' exceptions.

The first cause of action pleaded and submitted to the jury was based on an alleged violation of sections 50 and 51 of the Civil Rights Law. Section 50 makes it a misdemeanor to use the name, portrait, or picture of any living person for advertising purposes without consent. And section 51 gives to any person whose name, portrait, or picture is so used a right to civil remedies, through injunction and damages. The appellee, having adopted the name "Aunt Jemima" for use in her professional career, had acquired certain rights. With the growth of her fame and reputation, she became the more closely identified by such name. By it she was known to the theatrical world and to the theater-going public.

■ Appellants contend that the statute does not relate to a stage or other fictitious or assumed name and refer to Davis v. R. K. O. Radio Pictures, Inc., 16 F.Supp. 195 (D.C.N.Y.). The question has not been passed upon by the New York state courts. Having in mind the evident purpose of the statute, its application to a public or stage name, as well as a private one, seems inevitable. Uproar Co. v. N. B. C., 8 F.Supp. 358 (D.C.Mass.), modified in other respects, 81 F.(2d) 373 (C.C.A.1), cert. den. 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393; Binns v. Vitagraph Co., 210 N.Y. 51, 103 N.E. 1108, L.R.A.1915C, 839, Ann.Cas. 1915B, 1024; Derenberg, Trade-mark Protection & Unfair Trading, p. 154 (1936). If the stage name has come to be closely and widely identified with the person who bears it, the need for protection against unauthorized advertising will be as urgent as in the case of a private name; if anything, the need will be more urgent. The public character of a name may mean the surrender of a certain degree of privacy and may affect the extent and limit of the protection accorded. But the abuse of such a name by an advertiser cannot be justified, and it is against such abuse that the statute is directed.

■ But here the statute is inapplicable. As already indicated, from 1890 trade-mark rights in the name Aunt Jemima have existed and the Quaker Oats Company became the assignee of such rights. The right to use that name and the fictitious character it represents extends not only to the designation of the product but to the various forms by which it may be advertised. In both respects a complete user of the name has been established. Whatever may be the appellee's rights under the statute against the rest of the world and whatever other rights she may have against the appellants, no right of privacy as defined by the statute exists here. The statute protects against the unauthorized use of a name for the purpose of advertising. But the Quaker Oats Company needed no authority from the appellee to use the name "Aunt Jemima."

The second cause of action pleaded, and upon which the judgment rests, is for unfair competition. It is claimed that, upon the failure of the negotiations between appellants and the appellee, Eva Taylor was hired to imitate appellee's style and manner of singing and that by the unlawful use of appellee's name the public was misled into believing that the appellee participated in the broadcasts. It is stated in addition that the counterfeit performance was of inferior quality, thereby injuring the appellee's reputation and earning power as a performer. In reality this cause of action divides itself into two theories. One is that the appellee was imitated and that the imitation resulted in deception; the usual form of "passing off." The second is that the imitation was inferior so that the appellee's professional reputation was impaired. This contains a claim of defamation.

■ We may concede appellee's fame in the theatrical world as a performer and that she had become exclusively identified by the name "Aunt Jemima." Within the sphere of her fame and activities, the name "Aunt Jemima" had acquired this

unique significance, and she may rightly complain of the pirating of such secondary meaning as she has given to it. She may be protected against counterfeiting which deceives the public and perpetrates a fraud upon the public and herself. Chaplin v. Amador, 93 Cal.App. 358, 269 P. 544; Kimball v. Hall, 87 Conn. 563, 89 A. 166, L.R.A.1916E, 632. See Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299 (C.C.A.2). Appellants would have no right to trade upon her reputation or to pass off an imitation of her singing or form of entertainment which either caused deception, Sweet Sixteen Co. v. Sweet "16" Shop, 15 F.(2d) 920 (C.C.A.8), or was likely to do so, Queen Mfg. Co. v. Isaac Ginsberg & Bros., 25 F.(2d) 284 (C.C.A.8). In such circumstances, the appellee would be entitled to recover such actual damages as were established by competent and satisfactory evidence. Dickinson v. O. & W. Thum Co., 8 F.(2d) 570 (C.C.A.6); Derenberg, supra, p. 756.

■ Profits are claimed, but these can be granted only in equity upon the theory of a trust ex maleficio. Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 259, 36 S.Ct. 269, 60 L.Ed. 629. No loss of wages or engagements is proved. Though punitive damages may be superimposed on nominal damages, where there is a malicious or deliberate wrong [Press Pub. v. Monroe, 73 F. 196, 51 L.R.A. 353 (C.C.A. 2); Lampert v. Judge & Dolph Drug Co., 238 Mo. 409, 141 S.W. 1095, 37 L.R.A.(N. S.) 533, Ann.Cas.1913A, 351; contra, Stacy v. Portland Pub. Co., 68 Me. 279], the rule of Lake Shore & Michigan Southern Ry. Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97, requires that, in order to assess them against a corporation, the act of its agent must be in some way authorized or ratified. See, also, Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 115, 47 S.Ct. 509, 71 L.Ed. 952, 51 A.L.R. 1376; Western Union Tel. Co. v. Aldridge, 66 F.(2d) 26, 89 A.L.R. 352 (C.C.A.9). The proof failed to establish that there was a malicious or deliberate wrong chargeable to the appellants to justify the imposition of punitive damages. The appellee testified that when her negotiations with appellants' advertisers collapsed they threatened to procure a counterfeit performer, the implication being that the acts of unfair competition were deliberately planned. Appellants categorically deny the making of this threat. But, assuming that it was made and that the wrong, if any, therefore partook of a malicious character, it would be attributable to the advertising agency's representative, not to the appellants. Rogers was the agency's employee engaged in preparing the advertising campaign. To impute the malicious wrong to the corporate appellants, so as to support punitive damages, it would not be enough that the act committed was within some apparent authority which the appellants may have created. It would have to appear that the appellants in a more or less direct way "participated in the offense." Lake Shore & Michigan So. Ry. Co. v. Prentice, supra. In other words, the tests used to determine a principal's liability for compensatory and for punitive damages are not the same. The appellee contends that some of the appellants' higher officers knew of her as the famous Aunt Jemima and also that acceptance of the benefits of the broadcasts must be accompanied by a full acceptance of its responsibilities. Whatever bearing these facts may have elsewhere, they obviously do not prove an authorization or ratification of Rogers' act adequate to establish a participation in the malicious wrong with which he is charged.

The right, if it exists, to damages for injury to reputation, falls under the next heading; and we conclude, therefore, that on this branch of the cause of action appellee is entitled only to nominal damages. Lampert v. Judge & Dolph Drug Co., supra; Kimball v. Hall, 87 Conn. 563, 89 A. 166, L.R.A.1916E, 632.

■ The gravamen of the second phase of the cause of action, though not so stated in exact words, is that the professional reputation of the appellee has been defamed. Eva Taylor acted only under the name "Aunt Jemima" and her performance is alleged to have been in imitation of the appellee and to have been of inferior quality, thus causing deception to the public and inducing the belief that appellee's abilities had deteriorated. If we assume these claims to be true, a cause of action for unfair competition is stated which in turn consists of the tort of defamation. Injury to professional reputation, whether it be in the form of slander or libel, is one which the law recognizes and for which it grants a remedy. The right to a remedy at law has always been clear. Cruikshank v. Gordon, 118 N.Y. 178, 23 N.

E. 457; Bornmann v. Star Co., 174 N.Y. 212, 66 N.E. 723. It is only with respect to equitable relief against defamation that obstacles have been encountered, courts of equity having denied their power to intervene. American Malting Co. v. Keitel, 209 F. 351 (C.C.A.2); Everett Piano Co. v. Maus, 200 F. 718 (C.C.A.6); Marlin Fire Arms Co. v. Shields, 171 N.Y. 384, 64 N.E. 163, 59 L.R.A. 310; compare: Maytag v. Meadows Mfg. Co., 35 F.(2d) 403 (C.C.A.7), cert. den. 281 U.S. 737, 50 S.Ct. 250, 74 L.Ed. 1151; Allen Mfg. Co. v. Smith, 224 App.Div. 187, 229 N.Y.S. 692.

If appellee's professional reputation, her ability, skill, and competence as a theatrical entertainer were defamed, her rights are no different and no less because the method of communication was that of poor imitation or simulation accompanied by a use of the name "Aunt Jemima." If the effect was one of actual impersonation, and if the impersonation was defamatory, relief would follow. In Ben-Oliel v. Press Pub. Co., 251 N.Y. 250, 167 N.E. 432, the plaintiff, a lecturer and scholar of life in Palestine and under Mosaic law, alleged that the defendant printed an article purportedly written by the plaintiff which contained falsities and made her out an ignorant impostor to those familiar with her field. In holding a cause of action was stated, the court agreed that the defamatory communication might take the form of "self-revelation." So here the defamation, if any, could be communicated by a performance with which the appellee was so identified that it would be thought to be hers. Schultz v. Frankfort Marine, Acc. & Plate Glass Ins. Co., 151 Wis. 537, 139 N.W. 386, 43 L.R.A.(N.S.) 520, indicates the various forms which communication may take. It was there held that the act of openly and publicly following and shadowing the plaintiff constituted a libel, since it was tantamount to proclaiming him a suspect and equally subjected him to contempt and ridicule.

If there was a deceptive imitation which amounted to an impersonation, an inferior performance would constitute an attack upon appellee's professional reputation. To have said of her, whether in writing or orally, that her abilities had suffered, or that she was an incompetent singer, or that she was no longer the able and talented entertainer the public knew her to have been, would constitute a clear injury to her reputation. To say it by self-revelation is the same thing and, if anything, is more effective. In either case the appellee suffers in her profession just as much as the clergyman who is charged with immorality, Haynes v. Robertson, 190 Mo.App. 156, 175 S.W. 290, or the physician who is accused of incompetence or negligence, Elmergreen v. Horn, 115 Wis. 385, 91 N.W. 973; Crane v. Darling, 71 Vt. 295, 44 A. 359.

■ In cases of disparagement or defamation of property the common-law rule seems to be that actual damages must be established. Cf. Marlin Fire Arms Co. v. Shields, supra; Pound, Equitable Relief against Defamation, 29 Harvard Law Review, 663. There is an indication in the cases, however, that in actions for unfair competition damages for injury to the reputation of a product may be awarded without proof of actual loss. Coca-Cola Co. v. Vivian Ice, Light & Water Co., 150 La. 445, 90 So. 755; Conrad v. Joseph Uhrig Co., 8 Mo.App. 277; see Baker & Co. v. Slack, 130 F. 514 (C.C.A.7). Cf. Nims on Unfair Competition and Trade Marks, § 422. That problem need not concern us, however, since the complaint here is of injury to the appellee's reputation in her profession. Accordingly, whether we choose to call it slander or libel, damages may be awarded without proof of actual loss. Maytag v. Meadows, 45 F.(2d) 299 (C.C.A.7); Ben-Oliel v. Press Pub. Co., supra; Crane v. Darling, supra. Moreover, mental distress, of which some claim is made by the appellee, may be considered in the estimation of damages. Palmer v. N. Y. News Pub. Co., 31 App.Div. 210, 52 N.Y. S. 539; Harper on Torts § 242 (1933).

■ With these principles of law in mind, we must examine the evidence and consider the question of proof. In both theories, that of "passing off" and of defamation, there is a common element, essential to recovery upon either. The proof must be adequate in either case that the Aunt Jemima of theatrical renown was confused with the Aunt Jemima of the advertising broadcasts. Deception of the public or its likelihood in the "passing off" is essential to the first theory. Keystone Type Foundry v. Portland Pub. Co., 186 F. 690 (C.C.A.1); Queen Mfg. Co. v. Isaac Ginsberg & Bros., supra. And of course one cannot speak of defamation here without actual confusion or deception. The element of impersonation must exist. In determining whether there was evidence

upon which a finding of confusion could properly be made, several factors must be kept in mind. It must be remembered that the right to the name "Aunt Jemima" existed concurrently in two parties, each with its privileges in distinct spheres. The right of the Quaker Oats Company was the older and took origin in registered trademarks. It was kept alive and brought constantly to the notice of the public by use both in the designation of the product and in advertisements. Appellee's right took shape with the growth of her theatrical fame. Though it is true that the rights functioned in different spheres, there was one point at which they may be said to have merged closely. The Quaker Oats Company could advertise its product in whatever form it pleased and could freely employ its fictitious character, Aunt Jemima, in so doing. The rights of the appellee could be impinged upon only in the event that the fictitious Aunt Jemima was so used as to confuse her with appellee as the theatrical Aunt Jemima. To prevent this, identification of the fictitious character was alone necessary. This defines the limits of the appellants' duty and of the appellee's right.

In testing the sufficiency of this identification, the need for definiteness and particularity must be judged by the probable reaction of the public mind; and this in turn must be judged with a view to the significant fact that the fame of the fictitious Aunt Jemima—the Aunt Jemima of the product and its advertising—was at least as great in its own sphere as that of the real Aunt Jemima. This fact, by reducing the probability of confusion where an advertising broadcast was concerned, qualified the duty of identification.

Throughout the years of advertising the pancake flour, the use of the fictitious character has been constant. There is proof that on numerous occasions colored women were engaged to portray Aunt Jemima; costumes were kept on hand which were furnished for amateur theatricals; in 1929 a colored performer was engaged for an extensive series of radio broadcasts put on by the Quaker Oats Company. She assumed the fictitious role of Aunt Jemima and sang on those programs. These facts, considered in the light of what has been said above, sufficiently indicate that the fictitious character, associated with the extensive advertising of a famous product, was thoroughly familiar to the public mind.

Appellee relies upon several facts in her attempted proof of confusion. First, there were two exhibits—letters mailed by radio listeners in response to a contest which was initiated during the broadcasts in question. One of these was addressed to "Aunt Jamima, N.B.C., Radio City, N. Y."; another to "Aunt Jemima, New York, N. Y." These letters were forwarded by a clerk of the N.B.C. to the appellee. But they do not prove deception resulting from the broadcasts, for it is not shown that the clerk ever listened to them. Moreover, on one occasion several years previously, the appellee, in conjunction with one of her vaudeville acts, distributed sample packages of pancake flour which the Quaker Oats Company supplied upon request. But this does not mean that the appellee became identified with the fictitious or "pancake" Aunt Jemima. It is said that Eva Taylor, who only sang in these broadcasts, was uniquely qualified to imitate and simulate the appellee in view of her husband's previous professional contact with the appellee, and that the jury could properly find such imitation from recordings made by the appellee and those of the broadcasts which were played to them. Beyond this there is no proof that Eva Taylor did anything more than exercise her natural talents and propensities. It does not seem to be argued that Georgia Burke in her dialogue did anything more than any colored performer would have done to play her part.

Even if a finding of some degree of imitation were possible, it does not follow that deception was established. Imitation and deception may frequently be handmaids; not necessarily so under the singular facts here. The appellee Aunt Jemima and the "pancake" Aunt Jemima had numerous features in common. Appellee in adopting the character of a singing colored woman, together with the name "Aunt Jemima," rendered inevitable some degree of similarity. It must be assumed that the public was accustomed to, and was cognizant of, the common features. That identification sufficed which clarified and emphasized the fictitious character of the "pancake" Aunt Jemima. An examination of the broadcast script reveals that whenever Aunt Jemima was referred to or introduced it was always in the form of advertising pancakes and syrup. Aunt

Jemima was predominantly the "pancake" Aunt Jemima.

We conclude, therefore, that the cause of action under the Civil Rights Law should have been dismissed. Proof of confusion or deception required to support the cause of action resting on unfair competition may be established only as stated in this opinion. On this record the judgment must be reversed.

Judgment reversed.