MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 34
Docket:        BCD-22-216
Argued On:     February 7, 2023
Decided:       May 9, 2024

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, and LAWRENCE, JJ.*

KINDERHAUS NORTH LLC et al.

v.

KARL NICOLAS et al.

MEAD, J.

[¶1]  Kinderhaus North LLC, Prime Properties ME LLC, and Karen and Brian Fullerton (collectively, the Fullertons) appeal from a judgment entered in the Business and Consumer Docket (*Duddy, J.*) concerning their expressly deeded easement across Karl and Stephanie Nicolas's property.  The Fullertons argue, inter alia, that the judgment must be vacated because the court erred in finding an ambiguity in the deed language and in awarding damages, including punitive damages, for timber trespass and common law trespass.  For the reasons stated below, we vacate the court's judgment on those issues and remand for further findings.  The Fullertons also contend that the court erred

---

*Although Justice Jabar participated in the appeal, he retired before this opinion was certified.

in entering summary judgment against them on their slander of title and abuse of process claims.  We disagree and affirm the judgment in that regard.

## I.  BACKGROUND

[¶2]  "The following facts are drawn from the procedural record and the court's findings, which are supported by the record."  *Lamkin v. Lamkin*, 2018 ME 76, ¶ 2, 186 A.3d 1276.

[¶3]  This case concerns a vehicular and pedestrian right-of-way (ROW) within the Abner's Point Lots Plot Plan (the Plan) on Bailey Island in Harpswell. The lots laid out in the Plan were developed in 1979 by Bruce and Joanne Allen. As shown in this map, which was attached to the court's judgment, there are a total of six lots in the Plan.



PLAN OF ABNER'S POINT
LOTS ON BAILEY ISLAND
HARPSWELL, MAINE

[¶4]  The Fullertons own four of the six lots: Lot 1 is owned by Prime Properties ME LLC, Lot 2 is owned by Kinderhaus North LLC, and Lots 5 and 6 are owned by Karen and Brian Fullerton.  Karen is a member and the manager of both Prime and Kinderhaus.  Karl and Stephanie Nicolas own Lot 4.[1]

[¶5]  The parties do not dispute that their chains of title and the town-approved subdivision plan establish a twenty-foot-wide ROW benefitting

---

[1] Lot 1 is immediately northwesterly of, and contiguous to, Lot 2 and has frontage on Merriconeag Sound.  Lot 2 has frontage on the Abner Point Road right-of-way.  Lot 4 is located easterly of Lots 1 and 2, has frontage on the Abner Point Road right-of-way and Merriconeag Sound, and shares a common boundary line with Lots 1 and 2.

4

Lots 1 and 2 running along the southwesterly boundary of Lot 4 for the entire length of the common boundary with Lots 1 and 2.  The operative language in the deeds to Lots 1 and 2 provides:

> The above described Lot 1 and Lot 2 are conveyed with the benefit of a twenty (20) foot wide right of way for vehicular as well as foot traffic.  Said right of way being located on the southwesterly boundary line of Lots 4 and 5 and to be used in common with the owners of lot 4.  For a more particular description of the Lots and rights of way, reference may be had to the aforesaid Plan of ABNER'S POINT.

The operative language in the deed to Lot 4 provides:

> The above described Lot 4 is conveyed subject to a twenty (20) foot wide right of way for vehicular as well as foot traffic for the benefit of the owners of Lots 1 and 2 on said Plan of ABNER'S POINT.  Said right of way being located on the southwesterly boundary line of Lot 4.  For a more particular description of the Lot and rights of way, reference may be had to the aforesaid Plan of ABNER'S POINT.

Numerous trees of varying size, description, and age, as well as a granite post, are located within the easement.  One of the trees, a large red pine, is located slightly northwest of the eastern boundary of the easement and the intersection of the boundary between lots 1 and 2.[2]

[¶6]   Shortly before Prime and Kinderhaus finalized the purchase of Lots 1 and 2, the real estate broker representing them contacted the Nicolases

---

[2] The location of the red pine is a pivotal point in the trial court's analysis and judgment.

and led the Nicolases to believe that the Fullertons claimed a vehicle and pedestrian ROW over Lot 4. The Nicolases sought a negotiation that would result in the Fullertons releasing their rights to the easement and sent a legal opinion and an offer of a compromise to the Fullertons. The Fullertons notified the Nicolases of their ROW rights and stated that there were obstructions, including the granite lamp post and several trees, blocking their use of the ROW. The trees and lamp post identified by the Fullertons had been installed by the Nicolases' predecessor-in-title at or after the original conveyance of the ROW.

[¶7] On May 23, 2018,[3] the Nicolases were informed that the Fullertons intended to construct a gravel drive on the ROW and that the obstructions needed to be removed, giving the Nicolases the opportunity to remove the obstructions before construction began. Karen Fullerton testified at the trial that a well driller was scheduled to arrive on Lot 1 in early July and that she intended to have a well dug on that lot adjacent to two spruce trees at the far end of the ROW.

[¶8] On June 14, 2018, the Nicolases recorded a notice pursuant to a provision of Maine's Paper Streets Act, 23 M.R.S. § 3033 (2024), (the section

---

[3] As discussed *infra*, at some point in April 2018, Karen Fullerton intentionally and without consent entered the Nicolases' property and walked fully around the curtilage of the house while the Nicolases were not present.

3033 Notice), "claim[ing] to own a portion of the [ROW]." The Paper Streets Act allows other claimants to contest the existence of private rights within proposed, unaccepted ways that are the subject of a section 3033 notice. 23 M.R.S. §§ 3032, 3033 (2024). On June 20, the Fullertons received a copy of the section 3033 Notice, and on June 28, through counsel, they disputed the applicability of section 3033.

[¶9] The next day, the Nicolases arrived at Lot 4 and found Karen Fullerton in the process of removing trees that the Fullertons had identified as obstructions in the May 23 letter. Karen was holding a chainsaw and actively cutting down a juniper tree that was approximately thirty years old and located near the granite light post. Two weeping cherry trees and a native cherry tree had already been cut down and removed. Each of the ornamental cherry trees was approximately fifteen to nineteen years old and had been planted by the prior owners in 2010 or 2011. All of the trees that Karen cut were in excellent health, and none of them blocked vehicular or walking traffic within the ROW because approximately eleven feet of open travel space remained available. A verbal altercation ensued, and Karl Nicolas asked Karen to leave.

[¶10] On September 24, 2018, the Fullertons filed a complaint in the Superior Court asserting several tort claims and seeking declaratory and

injunctive relief. The Nicolases asserted several counterclaims, including trespass; they also sought declaratory relief. In October and November 2019, both parties moved for partial summary judgment.

[¶11] The court entered a partial summary judgment for the Fullertons, declaring that they have an expressly deeded easement over the Nicolases' Lot 4. The judgment declared that the twenty-foot-wide ROW runs the full length of Lot 4 and borders Lots 1 and 2, as drawn on the Plan. Lots 5 and 6 have an expressly deeded walking ROW, and Lots 1 and 2 have an expressly deeded vehicular and walking ROW. As a result of the court's finding that an express easement had been created, several claims were dismissed.

[¶12] The court also entered a partial summary judgment for the Nicolases on the Fullertons' slander of title, abuse of process, nuisance, and conversion claims, as well as their request for punitive damages.

[¶13] In subsequent proceedings, the Fullertons argued that because they have an expressly deeded easement, no ambiguity exists and they have an unlimited right to use the full length and width of the ROW for pedestrian and vehicular traffic, including the right to remove any obstructions and disturb the soil as necessary. The Nicolases countered that an ambiguity exists concerning the scope and purpose of the easement and that the Fullertons did not have an

8

unlimited right to use the full length of the ROW—specifically asserting that the scope of the easement did not allow the Fullertons to disturb the soil or materially alter the surface.

[¶14] The court conducted two site visits[4] and subsequently held a bench trial on August 30-31, 2021. The court entered a judgment on March 3, 2022. On April 12, 2022, the court issued, upon the Nicolases' motion, a corrected judgment to correct a clerical error. The court concluded that there was ambiguity within the deed language as it relates to the purpose and scope of vehicle use of the ROW. Relying upon extrinsic evidence, the court declared:

> The ROW was intended to provide driveway access to Lots 1, 2, and 4, and the surface of the driveways may be paved or graveled, but the driveway for Lot 1 cannot extend past the red pine tree. . . . The ROW was also intended to provide walking water access to the Sound.

The court concluded that the Fullertons did not have an unlimited right to use the entire width and length of the ROW as a driveway because the intended purpose included a pedestrian ROW and the topography was not suitable for vehicular traffic beyond the large red pine tree centered within the ROW. The granite lamp post was deemed an obstruction, and the Nicolases were ordered

---

[4] The formal site visits, done at the request of the parties, were conducted on October 6, 2020, and June 30, 2021. Counsel were present as well as those parties who wished to attend.

to move it at least three feet toward Lot 4.

[¶15]  The court found that the trees did not prevent vehicle or pedestrian passage within the boundaries of the easement.  The court additionally found that Karen, acting on behalf of herself and Prime, committed a timber trespass pursuant to 14 M.R.S. § 7552(2)(A) (2024) when she intentionally and knowingly cut down, destroyed, and carried away four ornamental trees, and that she had acted with both actual and implied malice.[5]  The Nicolases were awarded timber trespass damages jointly and severally against Karen and Prime.  In an amended judgment[6] the court set the base damages at $45,600 and awarded $136,800 for timber trespass damages (three times the base damages), and $91,200 for punitive damages (two times the base damages), for a total damages award of $228,000, plus interest.  *See* 14 M.R.S. § 7552(4)(B), (D).  The court additionally awarded the Nicolases $37,830.20 in attorney fees and costs pursuant to 14 M.R.S. § 7552(5).

---

[5] At trial, the court excluded a letter to the Fullertons from their attorney that offered an opinion concerning their rights regarding the easement.  Although the letter was inadmissible as expert testimony regarding the Fullerton's substantive rights, it was admissible on the issues of actual malice and Karen's state of mind (i.e., whether she acted with a good faith belief that she was within her legal rights in removing the obstructions).

[6] The court initially awarded quadruple damages and amended the judgment after the Fullertons moved to alter or amend it pursuant to M.R. Civ. P. 59(e).

[¶16] The court also found that Karen committed a common law trespass when she intentionally, without consent, and acting with malice, entered the Nicolases' property in April 2018 "in order to snoop around." The Nicolases were awarded $1 in nominal damages and $5,000 in punitive damages against Karen personally. The court denied the Fullertons' M.R. Civ. P. 60(b)(1) motion for relief from the judgment on the ground of surprise.

[¶17] The Fullertons filed a M.R. Civ. P. 52(b) motion for amended and additional findings and a Rule 59(e) motion to alter or amend the judgment, requesting forty-four additional or amended findings of fact and several amended conclusions of law. The court granted the motion in part, making some additional findings of fact and amending one of its findings. The Fullertons timely appealed. 14 M.R.S. § 1851 (2024); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶18] On appeal, the Fullertons contend the court erred in (A) finding an ambiguity in the deed language and using extrinsic evidence to determine the grantors' intent; (B) finding that Karen was not within her rights to remove obstacles in the ROW; (C) applying the timber trespass statute and awarding treble and punitive damages for timber trespass; (D) denying their motion for relief from judgment on the common law trespass claim and awarding punitive

damages on that claim; and (E) granting summary judgment for the Nicolases on the Fullertons' slander of title and abuse of process claims. We address these contentions in turn.

## A. Deed Language, Extrinsic Evidence, and Latent Ambiguity

[¶19] From the beginning of this case, the parties and the trial court focused on the facts and circumstances surrounding the creation of the easement to determine the grantor's intent regarding the scope and purpose of the ROW. Although the court's inquiry was the correct one, we conclude that the process it used in arriving at its result was not. Furthermore, we are unable to determine without further specific findings whether the court found that the topography made the northwesterly section of the easement impossible for vehicles to negotiate, or merely impractical.

[¶20] "When interpreting a deed, a court should first look for the controlling intent of the parties on the face of the deed," *Tremblay v. DiCicco*, 628 A.2d 141, 143 (Me. 1993), and "[t]he scope of a party's easement rights must be determined from the unambiguous language on the face of the deed," *Jordan v. Shea*, 2002 ME 36, ¶ 14, 791 A.2d 116.

[¶21] Given the language of the Fullertons' deeds, the court correctly determined that the deeds grant the Fullertons clear and express easement

rights over the Nicolases' property and that "the easement was established to permit the vehicular and pedestrian access of Lots 1 and 2." The court further found, again correctly, that, given the language of the deed, "the [grantors'] intent to establish an easement for the benefit of their retained land is unambiguous."

[¶22] Notwithstanding those findings, the court later determined that that same deed language was ambiguous as to the easement's scope and purpose concerning vehicular accessibility past the red pine tree in the right-of-way. In doing so, the court went beyond the clear and express terms of the easement and relied on extrinsic evidence, consisting largely of the court's in-person observation of the topography, its own assessment of vehicular accessibility, and testimony from a land surveyor to discern the grantors' intent at the time the easement was created. This was error because, given that the four corners of the deed present no patent ambiguity, the court was required to give the conveyance its ordinary meaning without resort to extrinsic evidence. *See Doyon v. Fantini*, 2020 ME 77, ¶ 7, 234 A.3d 1222; *see also Sleeper v. Loring*, 2013 ME 112, ¶ 18, 83 A.3d 769; *Badger v. Hill*, 404 A.2d 222, 225 (Me. 1979).

[¶23] In support of its resort to extrinsic evidence, the trial court

reasoned:

> Here, the location, length, and width of the ROW is clearly defined in the deeds and depicted on the Plan. Based on the language of the deeds, the court previously determined Lots 1 and 2 have express, deeded easement rights in the ROW for "vehicular as well as foot traffic." The deed language, however, is silent as to the purpose and scope of the ROW regarding vehicles . . . .

[¶24] Although the court framed its analysis as determining the scope and purpose of the easement language, what it did, in substance, was apply a latent ambiguity analysis without saying so. The deed language remained unambiguous, however the court concluded that the extrinsic evidence created an ambiguity as to the grantors' intent underlying the deeds notwithstanding the unambiguous language.

[¶25] The ultimate purpose in construing a deed is to ascertain the intent of the parties, using the language of the deed *as a starting point*. *See Milligan v. Milligan,* 624 A.2d 474, 477 (Me. 1993) ("When interpreting a deed, a court should first look for the controlling intent of the parties on the face of the deed."). However, even if there is no ambiguity in the language of a deed, an ambiguity as to the intent underlying the deed can arise from extrinsic circumstances when the deed language is applied to the face of the earth. *Snyder v. Haagen*, 679 A.2d 510, 513 (Me. 1996) ("The intent of the parties may not be clear from the face of a deed . . . if the deed contains a latent ambiguity.").

14

"A latent ambiguity in a deed is created when, in applying the description to the ground, facts extrinsic to the document controvert or in some way render unclear the deed's apparently unambiguous terms." *Taylor v. Hanson*, 541 A.2d 155, 157 (Me. 1988); *see Tremblay*, 628 A.2d at 143. "When a deed contains a latent ambiguity . . . the trial court must determine the grantor's intent from contemporaneous circumstances and standard rules of construction." *Tremblay*, 628 A.2d at 143. "[S]tandard rules of construction dictate that boundaries are controlled, in descending order of priority, by monuments, courses, distances and quantity unless this produces a result that is absurd or manifestly inconsistent with the parties' intentions." *Lawton v. Richmond*, 1997 ME 34, ¶ 9, 690 A.2d 953 (quotation marks omitted).

[¶26]  Although the court erred in conflating its analysis of the unambiguous deed language with a broader latent ambiguity analysis, it considered all relevant circumstances in both determining that a latent ambiguity existed and in resolving the ambiguity consistent with the grantors' intent.  The court found, despite the unambiguous deed language, that the actual conditions on the ground created a latent ambiguity as to that intent—namely, whether the vehicular ROW was intended to extend past the red pine over ledges and down a steep slope all the way to the ocean.

[¶27]  The court concluded that the portion of the easement extending from the location of the red pine northwest to its terminus was "not reasonably suitable for residential vehicle traffic or for use as a residential driveway."  The court predicated its finding primarily on its personal inspection of the site.  The court further found that vehicles, other than a tracked vehicle, have never used the stretch of the easement beyond the red pine.  Finally, the court found that the short stretch of the easement from the intersection with Lot 1 to the red pine was "the natural place from which to provide vehicle access to Lot 1."

[¶28]  Maine law has long held that rights to an easement do not extend to areas where geographic conditions render passage impossible.

> If there was any place along there where it was not possible to do that in the state of nature, then his right would not extend to that part.  If by reason of some ravine or some ledge on the line he could not get across the ravine or over the ledge, he could not claim a right to pass onto the forty foot strip over such ledge or ravine, but must content himself with where it was feasible.

*Cleaves v. Braman*, 103 Me. 154, 158, 160, 68 A. 857, 858-859 (1907) (quoting trial court's jury instruction with approval).

[¶29]  The court found only that the area northwest of the red pine is "not reasonably *suitable* for residential vehicle traffic or for use as a residential driveway."  (Emphasis added.)  One dictionary defines "suitable" as "acceptable or right for . . . something."  *Suitable*, Cambridge Dictionary, https:

//dictionary.cambridge.org/us/dictionary/english/suitable [https://perma.cc /H7AG-APEW]. Synonyms include descriptors such as "appropriate," "apt," "fitting," and other terms that lack the conclusive finality of "impossible" or "unfeasible." *Id*. Accordingly, the court's use of the word "suitable" appears to set the bar too low.

[¶30] Further, the court's subsequent observation that "the stretch of the ROW before the red pine tree is the natural place from which to provide vehicle access to Lot 1" suggests that it attempted to divine the grantors' intent concerning where the actual driveway entrance to Lot 1 should be located along the length of the easement. Without knowing what the court intended by its use of the word "suitable"—either that passage along the full length of the ROW was truly impossible or that traversing it by vehicle was merely ill-advised— we cannot fully undertake appellate review. Accordingly, we must remand for the court to make a finding regarding whether the topography of the easement northwest of the red pine renders all vehicle traffic—not only residential traffic—impossible or unfeasible.

## B.    Obstacles in a Right of Way

[¶31] Numerous trees of varying size and genus, four of which Karen removed, are or were located within the confines of the twenty-foot easement

as part of a "well-established landscape area on Lot 4," which is the servient estate.[7]  The record is fairly clear that the owners of the servient estate would have preferred that the removed trees remain and that other trees remain as they currently exist.  The owners of the dominant estate seek a declaration that they had the right to remove them.  Resolution of this issue turns upon the extent to which the holder of the dominant estate may remove permanent objects belonging to the servient estate that are located within the easement.

[¶32]  Maine law has been clear on this point for many years.  In 1898, we said in *Rotch v. Livingston*:

> [T]he . . . owners of the easement[] have under their grant the full right to use the entire width of fifty feet including the ten [foot] strip in front of the plaintiffs' lot for purposes of passage at their discretion, and are not limited in such right to what is necessary or convenient.  They hold by express grant and not by implication from necessity or convenience.

91 Me. 461, 472-73, 40 A. 426, 431 (1898).

[¶33]  More recently we said:

> If the grant of an easement expressly details its specific boundaries . . . the owner of the right of way is entitled to use the entire granted area, and is not limited to what is necessary or convenient.  Similarly, where the grant of an easement is clearly for the purpose of allowing free and convenient passage over a lot from every feasible point necessary for enjoyment of the easement, restriction

---

[7]  All of the removed trees were of mature growth with caliper diameters ranging from six to ten inches.

of access to a particular point is impermissible.

*Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, ¶ 6, 910 A.2d 392 (citing *Rotch*,

91 Me. at 472-73, 40 A. at 431; *Cleaves*, 103 Me. at 161, 68 A.2d at 860); *see also*

*Stanton v. Strong*, 2012 ME 48, ¶ 10, 40 A.3d 1013 ("[T]he law . . . holds that the

owner of an estate that is servient to an easement may not make a use of the

servient land which impairs effective use of the easement within the bounds of

the easement." (alteration and quotation marks omitted)).

[¶34]  The trees located within the easement would require the

Fullertons to zig-zag or otherwise use only a portion of the twenty-foot right of

way to avoid the trees.  It may be argued that this is a trifling inconvenience,

but as owners of the dominant estate, they have the unrestricted right to "use

the full extent of the described land for purposes consistent with the deeded

easement."[8]  *Mill Pond Condo. Ass'n*, 2006 ME 135, ¶ 7, 910 A.2d 392.

Concurrent with that right is the right to take reasonable measures to remove

obstacles.  *See Rockland Water Co. v. Tillson*, 75 Me. 170, 176 (1883) ("[T]he

owner of [an] easement may peaceably pursue his right against any

---

[8] The right to unfettered use of the full area of the easement is not, however, a blanket prohibition on any objects being placed within the space of the easement.  In *Mill Pond Condominium Association v. Manalio*, we sanctioned the existence of a sign in a small space that the dominant estate owners failed to establish was required for their ingress and egress.  2006 ME 135, ¶ 7, 910 A.2d 392.

obstructions which the land owner throws in the way of its enjoyment."). Although the abrupt use of self-help here is not commendable, it was done under an existing right of access provided by the express terms of the easement. Insofar as the trial court concluded that Karen was not within her rights as a dominant estate owner to remove the obstructing trees, we hold to the contrary.

## C.     Timber Trespass in a Right of Way

[¶35]   The question of whether the timber trespass statute, 14 M.R.S. § 7552(2)(A), applies to trees removed by the dominant estate owner as a matter of right when such trees present obstacles to free and full passage within the easement is a yet unsettled question of law in Maine.

[¶36]   "The interpretation of a statute is a legal issue that we review de novo." *Thurston v. Galvin*, 2014 ME 76, ¶ 13, 94 A.3d 16. "In interpreting a statute, we look to the plain meaning of the statute, interpreting its language to avoid absurd, illogical or inconsistent results and attempting to give all of its words meaning." *Jackson Lumber & Millwork Co., Inc. v. Rockwell Homes, LLC*, 2022 ME 4, ¶ 10, 266 A.3d 288 (quotation marks omitted).  The timber trespass statute provides:

> Without permission of the owner a person may not . . . [c]ut down, destroy, damage or carry away any forest product, ornamental or

fruit tree, agricultural product, stones, gravel, ore, goods or property of any kind from land not that person's own . . . .

14 M.R.S. § 7552(2)(A).

[¶37]  The statute does not define "owner" as used in the prohibition against removing or destroying forest products.  Given our holding that Karen was within her rights in removing the trees as the owner of the dominant estate, we conclude that she was an "owner" within the meaning of the timber trespass statute.  Accordingly, we vacate the trial court's judgment to the contrary, including its award of timber trespass damages.

## D.    Common Law Trespass

[¶38]  Karen argues that the court erred in finding that she committed common law trespass because the finding was based on surprise evidence, and that the award of punitive damages on that claim is contrary to Maine law.  She contends that the common law trespass claim was not based upon her entering the Nicolases' property and walking around the curtilage of their house in April 2018, but rather was part and parcel of the Nicolases' timber trespass claim.

### 1.    Motion for Relief from Judgment

[¶39]  Karen presented the same argument to the trial court when she filed a Rule 60(b)(1) motion for relief from judgment, which the court denied

because it "heard credible testimony from . . . Karl Nicolas . . . [and Karen] failed to object to or defend against the testimony and . . . thus failed to preserve the issue." "We review the denial of a Rule 60(b) motion for abuse of discretion and will set aside the trial court's decision only if the failure to grant the relief works a plain and unmistakable injustice against the moving party." *Ezell v. Lawless*, 2008 ME 139, ¶ 19, 955 A.2d 202.

[¶40]  We conclude that Karen was not unfairly surprised because she had ample notice of the common law trespass issue in the form of the Nicolases' counterclaim and several post-trial briefs, and she failed to object or defend against the allegations.  She admitted at oral argument that she did not object to Karl's trial testimony because she did not believe it was relevant and simply regarded the testimony as a character attack, and further acknowledged that the initial claim asserted by the Nicolases was very broad and could have encompassed a claim of common law trespass.

[¶41]  On this record, the trial court acted well within its discretion in finding that Karen was not entitled to relief from judgment concerning the common law trespass claim.

### 2.  Punitive Damages

[¶42] We now turn to the award of punitive damages on the common law

trespass claim. Karen argues that the court's award of $5,000 in punitive damages after awarding only $1 in nominal damages is contrary to Maine law and "likely unconstitutional," citing *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 425 (2003). "Under Maine law, punitive damages may be awarded for tortious conduct only if the defendant acted with malice. . . . We review for clear error a finding of malice to determine if the fact finder could reasonably have been persuaded that the required factual findings were proved to be highly probable." *Sebra v. Wentworth*, 2010 ME 21, ¶ 14, 990 A.2d 538 (quotation marks omitted).

[¶43] The court's finding that Karen entered onto the Nicolases' property without consent is supported by Karl Nicolas's testimony that he observed her on a security video walking around the pool, the house, and near the wharf, far from the ROW access. Upon that finding, the court concluded that a common law trespass had been committed and rendered judgment in favor of the Nicolases and awarded nominal damages.

[¶44] The court's additional award of $5,000 in punitive damages was predicated upon its findings that Karen had "absolutely no purpose in entering upon the Nicolases' property, other than to exercise dominion over the property and satisfy her own illegitimate interests," and that "[h]er conduct

was outrageous and demonstrated contempt for and ill-will toward the Nicolases and their property rights." The court expressly found that "[h]er conduct reflected malice, express and implied," and the record supports that determination.[9]

[¶45] Karen cites *Zemero Corporation v. Hall*, 2003 ME 111, ¶¶ 10-11, 831 A.2d 413, for its holding that Maine law prohibits awarding punitive damages in the absence of an award of compensatory damages.[10] She argues that awarding only nominal damages forecloses the availability of punitive damages and the court's action in awarding punitive damages thus constituted legal error. Many other jurisdictions have held that an award of only nominal damages can provide a foundation for awarding punitive damages,[11] and we

---

[9] Although Karen characterizes the amount of punitive damages as excessive, we do not address that issue further in this opinion because it is intertwined with other matters that are subject to our remand order.

[10] In *Zemero Corporation v. Hall*, we held that

> [a]lthough there was evidence to support a punitive damage award, punitive damages are impermissible absent an award of compensatory damages. *DiPietro v. Boynton*, 628 A.2d 1019, 1025 (Me. 1993) ("Punitive damages . . . will lie only when the plaintiff receives compensatory or actual damages based on the defendant's tortious conduct."). Because [the plaintiff] did not request, and the court did not award, compensatory damages, the award of punitive damages must be vacated.

2003 ME 111, ¶ 11, 831 A.2d 413. *See also Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 15, 832 A.2d 771; *Zanville v. Garza*, 561 A.2d 1000, 1001-02 (D.C. 1989).

[11] *See, e.g.*, *Feld v. Feld*, 783 F. Supp. 2d 76, 77-78 (D.D.C. 2011); *Ryals v. Strategic Screening Sols., Inc.*, 117 F. Supp. 3d 746, 754 (E.D. Va. 2015) ("The concept that even award of nominal actual damages can support an award of punitive damages is no stranger to the law." (citing *Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 847, 853 (4th Cir. 1992))); *In re Wiggins*, 273 B.R. 839,

24

conclude that is the case here.

[¶46]  Common law trespass claims fall into the *sui generis* category of cases in which the plaintiff need not prove actual damages in order to prevail. *See Medeika v. Watts*, 2008 ME 163 ¶ 5, 957 A.2d 980 ("A person is liable for common law trespass 'irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally enters land in the possession of the other, or causes a thing or a third person to do so.'" (quoting Restatement (Second) of Torts § 158(a) (1965))) (also stating "if on remand the court does find that common law trespass was, or is, being committed, it must address the issue of nominal damages").

---

883 n.22 (Bankr. D. Idaho 2001); *Life Ins. Co. of Ga. v. Smith*, 719 So. 2d 797, 806 (Ala. 1998) ("[A] jury's verdict [must] specifically award either compensatory damages or nominal damages in order for an award of punitive damages to be upheld."); *Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 985 (Idaho 2004) ("The amount or type of damages alleged (whether significant, nominal, economic, physical or otherwise) is not determinative on whether the issue of punitive damages should be submitted to the jury."); *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 156 (Iowa 1993) ("The plaintiff need only show that the defendant actually caused plaintiff some injury to sustain a verdict for nominal compensatory damages (for example, one dollar) and punitive damages."); *Sanchez v. Clayton*, 877 P.2d 567, 573 (N.M. 1994) (allowing "punitive damages even when supported only by an award of nominal damages"); *Rhodes v. Harwood*, 544 P.2d 147, 158-59 (Or. 1975); *McGee v. Bruce Hosp. Sys.*, 545 S.E.2d 286, 288 (S.C. 2001) ("The rule in South Carolina is that there must be an award of actual or nominal damages for a verdict of punitive damages to be supported."); *Jacque v. Steenberg Homes, Inc.*, 563 N.W.2d 154, 161 (Wis. 1997) ("[A]ssuming that the other requirements for punitive damages have been met, we hold that nominal damages may support a punitive damage award in an action for intentional trespass to land."); *Tavadia v. Mitchell*, 564 S.W.3d 322, 327 (Ky. Ct. App. 2018) ("The rule that punitive damages may be awarded even when a nominal amount is awarded as damages was established early in our jurisprudence . . . ."); *Shabazz v. Bob Evans Farms, Inc.*, 881 A.2d 1212, 1234 (Md. Ct. Spec. App. 2005) ("In a proper case, a nominal damages award will support a punitive damages award."); *Mace v. Pyatt*, 691 S.E.2d 81, 89 (N.C. Ct. App. 2010) ("It is well established that merely nominal damages may support a substantial award of punitive damages." (alteration and quotation marks omitted)).

[¶47] Because the awarding of nominal damages in a common law trespass case reflects "damage . . . presumed to flow from a legal injury to a real property right," *Gaffny v. Reid,* 628 A.2d 155, 158 (Me. 1993), it bears a marked resemblance to compensatory damages awarded in other tort cases—in each instance the plaintiff recovers damages resulting from an injury. We therefore hold that punitive damages may be awarded in common law trespass cases where nominal damages are awarded, necessary factual findings are made, and controlling punitive damages law is correctly applied.[12] As we have noted, the

---

[12] In an 1878 case involving a claim of libel, we held that "punitive damages cannot be recovered where a jury finds that the only damages suffered were nominal." *Hall v. Edwards*, 138 Me. 231, 234, 23 A.2d 889, 890 (1942) (discussing *Stacy v. Portland Publ'g. Co.*, 68 Me. 279, 287-88 (1878)). The nature of the claim here distinguishes this case from *Stacy*. As noted *supra*, we have held that a common law trespass results in a legal injury that entitles the property owner to at least nominal damages. *See Medeika v. Watts*, 2008 ME 163, ¶ 5, 957 A.2d 980. In an extensive and persuasive analysis of the precise question presented here—whether a rule generated in a libel case requiring more than nominal damages before awarding punitive damages applies in an intentional trespass case—the Wisconsin Supreme Court held that "nominal damages may support a punitive damage award in an action for intentional trespass to land." *Jacque v. Steenberg Homes, Inc.*, 563 N.W.2d 154, 161 (Wis. 1997). In reaching that result, the *Jacque* Court reasoned:

> Because a legal right is involved, the law recognizes that actual harm occurs in every trespass. The action for intentional trespass to land is directed at vindication of the legal right. The law infers some damage from every direct entry upon the land of another. The law recognizes actual harm in every trespass to land whether or not compensatory damages are awarded. Thus, in the case of intentional trespass to land, the nominal damage award represents the recognition that, although immeasurable in mere dollars, actual harm has occurred.
>
> . . . .
>
> . . . We conclude that both the private landowner and society have much more than a nominal interest in excluding others from private land. Intentional trespass to land causes actual harm to the individual, regardless of whether that harm can be measured in mere dollars.

trial court's finding of malice here is supported by the record. *See supra* ¶ 44; *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me. 1985). We now turn to a discussion of the analysis necessary to determine appropriate punitive damages.

[¶48] We note at the outset the well-established rule that punitive damages are not intended to redress a party's concrete losses; those losses are addressed by compensatory damages. *See Estate of Hoch v. Stifel*, 2011 ME 24, ¶ 41, 16 A.3d 137. Rather, punitive damages address the purposes of deterrence and retribution. *Campbell,* 538 U.S. at 416; *Tuttle*, 494 A.2d at 1355. They serve purposes similar to punishments meted out in criminal matters. *See Tuttle*, 494 A.2d at 1358. The Due Process Clause of the United States Constitution "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Campbell,* 538 U.S. at 416; *see* U.S. Const. amend XIV, § 1.

[¶49] The United States Supreme Court has instructed courts, when awarding punitive damages, to consider (1) the degree of reprehensibility of

---

*Id.* at 160-61 (citations omitted).

To the extent that any uncertainty may remain regarding the precedential viability of the holding in *Stacy*, we hereby announce that it is expressly overruled.

the defendant's conduct, (2) the disparity between the actual or potential harm suffered by the injured party and the punitive damages award, and (3) the differences between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

[¶50] In *Campbell*, the Supreme Court discussed the three *Gore* considerations in detail. Concerning the degree of reprehensibility factor, which is "[t]he most important indicium of the reasonableness of a punitive damages award," the Court stated,

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

538 U.S. at 419 (citations and quotation marks omitted).

[¶51]   Concerning the disparity between the actual or potential harm suffered by the injured party and the punitive damages award, the Court said,

> [W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award.  We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.  Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.  In [*Pacific Mut. Life Ins. Co. v.*] *Haslip*, [499 U.S. 1, 23-24 (1991),] in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.  We cited that 4-to-1 ratio again in *Gore*[,] 517 U.S., at 581.

*Id.* at 424-25 (citations omitted).

[¶52]   Finally, discussing the third *Gore* factor, which requires consideration of the differences between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases, the Court noted,

> [I]n the past, we have . . . looked to criminal penalties that could be imposed.  The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action.  When used to determine the dollar amount of the award, however, the criminal penalty has less utility.  Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof.  Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award.

*Id.* at 428 (citations omitted). The *Campbell* Court went on to compare the punitive damages award in that case to a potential civil fine for similar conduct under state law. *Id.*

[¶53] The trial court here made a finding of malice, but its decision did not specifically address the *Gore* guidelines or the ratio between the award of nominal damages and the amount of the punitive damages. Although *Campbell* provides for de novo appellate review of a trial court's application of the *Gore* guidelines, *id.* at 418, we cannot undertake meaningful appellate review in the absence of those specific findings. We therefore remand to the trial court for analysis under the *Gore* guidelines and further findings as necessary.

## E.     Slander of Title and Abuse of Process Claims

[¶54]   The Fullertons next assert that the court erred in entering summary judgment against them on their slander of title and abuse of process claims related to the Nicolases' filing of the section 3033 Notice. "We review a grant of summary judgment de novo and will affirm if the record reflects that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Summary judgment is appropriate if the plaintiffs fail to establish a prima facie case for each element of their cause of action." *Rose v. Parsons*, 2013 ME 77, ¶ 7, 76 A.3d 343 (alterations, citation, and quotation

30

marks omitted).

### 1. Slander of Title

[¶55]  The Fullertons assert that the filing of the section 3033 Notice slandered their title because the court ruled that the Notice was used in error and they "were forced to initiate a legal proceeding to clear their title when no notice should ever have been filed."  "In order to recover for slander of title, a plaintiff must prove four elements: (1) publication of a slanderous statement disparaging a claimant's title to an interest in land, (2) the statement was false, (3) the statement was made with malice or with reckless disregard of its falsity, and (4) the statement caused actual damage."  *Pettee v. Young*, 2001 ME 156, ¶ 20, 783 A.2d 637.

[¶56]  The section 3033 Notice was filed by the Nicolases pursuant to Maine's Paper Streets Act.  "The Paper Streets Act was enacted in 1987 for the purpose of clarifying title to unclaimed paper streets and to eliminate the possibility of ancient claims. . . . [I]f title has not been reserved pursuant to [33 M.R.S.A.] section 469-A [(1999)],[13] the fee interest in [the] paper street[] . . . passes to the abutting property owners."  *Driscoll v. Mains*, 2005 ME 52, ¶ 8, 870 A.2d 124.

---

[13]  As subsequently amended, the statute is codified at 33 M.R.S. § 469-A (2024).

[¶57]  Section 3033 requires that specific information be included in the notice and dictates the manner in which the notice is to be recorded and sent. 23 M.R.S. § 3033(1).  The section 3033 Notice filed by the Nicolases contained the statutorily required information, including—importantly—the fact that the Town of Harpswell had identified the easement in question as a paper street.[14] Reviewing the notice, there is no evident slanderous or false statement, and the Fullertons do not point to any such statement.  They instead argue that because the section 3033 Notice was inapplicable in this case, the filing itself constitutes slander of title.

[¶58]  However, because the Fullertons fail to identify any slanderous or false statement contained in the section 3033 Notice, they fail to establish a prima facie case for each element of the tort.  We therefore conclude that the court did not err as a matter of law in granting summary judgment for the Nicolases on the Fullertons' slander of title claim.

### 2.  Abuse of Process

[¶59]  The Fullertons also assert the court erred in granting summary judgment on their abuse of process claim after determining that the

---

[14]  The reason why the Town of Harpswell identified the expressly conveyed easement as a paper street was not explored by the parties.

section 3033 Notice cannot serve as the basis for that claim.

[¶60] "Maine has recognized three distinct causes of action related to the misuse of the legal system: (1) abuse of process, (2) malicious prosecution (or wrongful use of criminal proceedings), and (3) wrongful use of civil proceedings." *Pepperell Tr. Co. v. Mountain Heir Fin. Corp.*, 1998 ME 46, ¶ 14, 708 A.2d 651 (footnote omitted). Abuse of process requires proof of two elements: "(1) the use of process in a manner improper in the regular conduct of the proceeding, and (2) the existence of an ulterior motive." *Jennings v. MacLean*, 2015 ME 42, ¶ 6, 114 A.3d 667 (quotation marks omitted).

[¶61] "The test [for abuse of process] is, probably, whether the process has been used to accomplish some unlawful end, or to compel the defendant to do some collateral thing which he could not legally be compelled to do." *Saliem v. Glovsky*, 132 Me. 402, 405, 172 A. 4, 6 (1934) (quotation marks omitted). "[A]buse of process addresses the allegedly improper use of individual legal procedures *after* a suit has been filed." *Leighton v. Lowenberg*, 2023 ME 14, ¶ 13, 290 A.3d 68 (emphasis added and quotation marks omitted). "'[P]rocess' generally means orders that are issued by courts at the behest of one of the parties, or that are otherwise backed by judicial authority. The most common forms of such process are subpoenas, warrants, and writs of garnishment or

attachments." *Id.* ¶ 15 (citation and quotation marks omitted).

[¶62]  In this case, because the Fullertons allege abuse of process, they must show that the section 3033 Notice was improper or that it was used after a lawsuit had been filed.  Here, the Notice was forwarded to the Fullertons by the Nicolases before any lawsuit had been filed.  Additionally, because it was founded upon a duly issued proclamation by the Town of Harpswell that the easement was subject to the Paper Streets Act, it cannot be said to be facially improper.  Accordingly, the Fullertons have failed to prove a prima facie case of abuse of process.  We therefore conclude that the trial court did not err as a matter of law in granting summary judgment for the Nicolases on that claim.

### III.  CONCLUSION

[¶63]  For the reasons set forth above, we vacate (1) the court's judgment limiting the use of vehicles in the northwesterly portion of the easement; (2) the award of damages for timber trespass; (3) the court's determination that removal of the trees within the easement was beyond the rights of the dominant estate; and (4) the award of punitive damages for common law trespass.  We remand for further findings regarding the degree to which vehicular passage upon the northwesterly portion of the easement is impossible and for additional analysis by the trial court applying the *Gore*

34

guidelines.  In all other respects, the judgment is affirmed.

The entry is:

> Judgment vacated as to (1) the trial court's declaration of the scope of the right of way, (2) the award of timber trespass damages, and (3) the award of common law trespass punitive damages.  Remanded for further action by the trial court consistent with this opinion.  The court may, in its discretion, reopen the proceedings to receive further evidence if it deems it necessary or appropriate to make further findings as required by this decision.  Judgment affirmed in all other respects.

Christopher Pazar, Esq. (orally), and William J. Kennedy, Esq., Drummond & Drummond, LLP, Portland, and Brendan O'Rourke, Esq., Thomson Bowie & Hatch LLC, Portland, for appellants Kinderhaus North LLC, Prime Properties ME LLC, Karen Fullerton, and Brian Fullerton

Jason Dionne, Esq. (orally), Dionne Law, P.A., Auburn, for appellees Karl Nicolas and Stephanie Nicolas

Business and Consumer Docket docket number RE-2019-9
FOR CLERK REFERENCE ONLY